# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| HYDE PARK VENTURE PARTNERS FUND III, L.P. and HYDE PARK VENTURE PARTNERS FUND III AFFILIATES, L.P., | ) ) ) ) | |
| Petitioners, | ) ) | |
| v. | ) ) | C.A. No. 2022-0344-JTL |
| FAIRXCHANGE, LLC, a Delaware limited liability company, as successor in liability to FAIRXCHANGE, INC., a Delaware Corporation, | ) ) ) ) ) | |
| Respondents. | ) ) | |

## MEMORANDUM OPINION
## GRANTING MOTION TO COMPEL

Date Submitted: February 14, 2023
Date Decided: March 9, 2023

A. Thompson Bayliss, Daniel J. McBride, Anthony R. Sarna, ABRAMS & BAYLISS LLP, Wilmington, Delaware; *Attorneys for Funds Hyde Park Venture Partners Fund III, L.P. and Hyde Park Venture Partners Fund III Affiliates, L.P.*

Paul J. Lockwood, Jenness E. Parker, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; Patricia L. Enerio, Jamie L. Brown, Aaron M. Nelson, Elizabeth A. DeFelice, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware; Stephen J. Senderowitz, DENTONS, Chicago, Illinois; Douglas W. Henkin, DENTONS, New York, New York; *Attorneys for Respondent FairXchange, LLC.*

**LASTER, V.C.**

While Ira Weiss was serving as a director of FairXchange, Inc. ("FairX" or the "Company"), Coinbase Global, Inc. made an acquisition proposal. Weiss wanted to retain an investment banker and explore alternatives. The other two members of the Company's board of directors (the "Board") wanted to pursue a transaction with Coinbase. They began excluding Weiss from the deal process, and they later arranged for a group of preferred stockholders to remove him from the Board.

Weiss was a partner in a venture capital firm. Two investment funds sponsored by the firm had made significant investments in the Company. While serving as a director, Weiss also managed the funds. He could not avoid sharing information about the Company with the funds, because Weiss (like all humans) has only one brain. Humans cannot partition their brains so that they only use particular knowledge for particular purposes. Weiss drew on a unitary store of knowledge when carrying out his dual roles as corporate director and fund manager.

After the Coinbase transaction closed, the funds filed this appraisal proceeding. During discovery, the Company asserted the attorney-client privilege to withhold information created during Weiss's tenure as a director. The funds have moved to compel production of the information.

The issue presented by the motion is not whether Weiss has the ability to access materials in his capacity as a former director. That issue is immaterial in the context of this litigation, because the funds have the ability to access materials through the discovery process. The question instead is whether the Company can invoke the attorney-client privilege against the funds to withhold documents that they otherwise would be

required to produce. Whether the Company can assert privilege depends on whether the Company had a reasonable expectation of confidentiality as to Weiss and the funds during Weiss's tenure as a director.

Since 1987, Delaware law has treated the corporation and the members of its board of directors as joint clients for purposes of privileged material created during a director's tenure. Joint clients have no expectation of confidentiality as to each other, and one joint client cannot assert privilege against another for purposes of communications made during the period of joint representation. Under this longstanding precedent, a Delaware corporation cannot invoke privilege against the director to withhold information generated during the director's tenure. All of the joint clients were within the circle of confidentiality when the privileged communications were made, so there is no privilege to invoke.

Since 1992, Delaware law has recognized that when a director represents an investor, there is an implicit expectation that the director can share information with the investor. Many investors appoint director representatives to monitor corporate performance—think of controlling stockholders, venture capital firms, and private equity firms—and information sharing is part of that process. Information sharing necessarily happens when a director representative serves dual roles because, to reiterate, a human has only one brain. Of course, director representatives use and share information at their own risk, and they can be liable for breach of fiduciary duty if they use the information or permit it to be used for an improper purpose. The bottom line for the attorney-client privilege is that under the joint client approach, the investor presumptively joins the

director within the circle of confidentiality, and the corporation cannot invoke the privilege against the investor for materials created during the director's tenure.

Three recognized methods exist by which a corporation can alter these default rules. First, as frequently happens, the parties can address the matter by contract, such as through a confidentiality agreement. Second, the board of directors can form a committee that excludes the director, at which point the committee can retain and consult confidentially with counsel. Third, once a sufficient adversity of interests has arisen and becomes known to the director, the director cannot reasonably rely on corporate counsel as to the matters where the interests of the director and corporation are adverse. At that point, the corporation can assert the attorney-client privilege as to the director. If a corporation believes that a sufficient adversity of interests exists, the corporation can put the director on notice of that fact, enabling the director to retain his own counsel and, if he wishes, call the question of information access through litigation.

In this case, the Company did not take any of the steps necessary to preserve the privilege. Weiss and the funds were inside the circle of confidentiality during his tenure as a director. Without the expectation of confidentiality on which the attorney-client privilege depends, the Company has no basis for asserting the privilege against the funds in this action. Their motion to compel is granted.

# I. FACTUAL BACKGROUND

The facts are drawn from the parties' submissions in connection with the motion to compel.[1] Given the procedural posture, this decision does not make formal findings of fact. Instead, the following summary reflects how the record appears at this stage of the proceedings for purposes of the discovery ruling.

## A. The Company

The Company was a Delaware corporation that operated a futures exchange. The Company's founders included Neal Brady and Clifford Lewis. Brady served as CEO, and Lewis served as Chairman of the Board.

The Company issued preferred stock to a group of investors. Two of the investors were Hyde Park Venture Partners Fund III, L.P. and Hyde Park Venture Partners Fund III Affiliates, L.P. (the "Funds"). Both are sponsored by Hyde Park Venture Partners, an early-stage venture capital firm that invests in high-growth technology startups. Together, the Funds owned approximately 15% of the Company's equity.

## B. The Preferred Stock Director

The preferred stockholders held the right to designate a member of the Board. They selected Weiss, who was a partner with Hyde Park Venture Partners. Weiss joined the Board on November 14, 2019. The other two members were Brady and Lewis.

---

[1] Citations in the form "Dkt. — Ex. — at —" refer to exhibits to the parties' submission in relation to the plaintiffs' motion to compel production of company-privileged information. Page citations refer to the internal pagination or, if there is none, then to the last three digits of the control number.

As a director, Weiss received privileged communications from DLA Piper LLP, the Company's counsel. DLA Piper also provided advice to Company management that Weiss did not receive contemporaneously.

## C.  The Coinbase Transaction

Beginning in the summer of 2021, the Company explored an investment from Coinbase. After conducting due diligence, Coinbase proposed an acquisition rather than an investment (the "Potential Transaction").

By letter dated October 28, 2021, Coinbase provided the Company with a letter of intent. Brady discussed the Potential Transaction with Coinbase that same day.

The following day, Coinbase sent the Company a revised letter of intent which increased the overall purchase price from $285 million to $330 million and increased the amount of cash consideration from $50 million to $65 million. The revised letter of intent also increased the portion of total consideration paid to key employees at closing from 25% to 35%, while lowering the portion of consideration paid to key employees one year after closing from 25% to 15%. The new letter of intent thus improved the aggregate consideration, while also benefitting the employees.

By email dated November 4, 2021, Weiss wrote to his fellow directors and DLA Piper with his "thoughts on a possible sales process." Dkt. 43 Ex. B at '546.

> As we know, FairX received a surprise unsolicited offer from Coinbase on October 29th (Friday night). This surprise offer is an incredible validation of the model for FairX, and all the amazing work that has been put in by the team to build FairX from scratch. I have never been involved in any other company that has executed as flawlessly as this one, and FairX has consistently exceeded my wildest expectations.

5

> While we should be flattered by this surprise offer, I believe we have to take a step back and make sure that (1) selling now would maximize shareholder value, and (2) if we do sell now, that we are getting a market price for the company.
>
> We are all fiduciaries on the board, and while we might view the same information differently, we all are tasked with maximizing value. I am not yet comfortable that the current process is maximizing shareholder value, and I would not vote in favor of this offer. We do not yet have a consensus at the board level for this acquisition, and we should strive to secure board consensus before involving other parties such as shareholders.
>
> FairX is currently well-capitalized with >$10M in the bank, so there is no need for us to rush into this offer.

*Id.* The email expressed concern about the timing of the deal (*e.g.*, "I think we should be particularly cautious about selling now because we have upcoming launches that could significantly enhance our value."), and whether the transaction price maximized value (*e.g.*, "If we choose to look for an acquirer now, we need to ensure there is an objective process that others can look at and know that we have taken the right steps to maximize shareholder value."). *Id.*

Weiss proposed that the Company retain an investment banker and continue to explore a financing round as an alternative. He explained that he wanted a better understanding of the Company's value. He recommended that an investment banker or other neutral party be present in any discussions between management and Coinbase that might touch on management incentives. He also identified other potential acquirers that the Company could consider approaching. *See id.* at '547.

On November 8, 2021, the Board met to consider the Potential Transaction. Weiss stated that he would not vote in favor of it and would advise the Funds to do the same. He

6

explained that he opposed moving forward with Coinbase because he (i) wanted the Company to conduct a market check and (ii) was concerned about the amount of Coinbase equity in the deal. *Id.* at '535. He reiterated his recommendation that the Company retain an investment banker. The Board rejected Weiss's proposal.

During the back and forth over the Coinbase proposal, DLA Piper made clear to Weiss that the firm represented him as a director. The lead DLA Piper attorney wrote in an email, "As I have now repeatedly told you, I'm happy to talk with you, but at this point, not with Hyde Park's outside counsel and you. I represent the board and shareholders of FairX, which includes your firm and you as a board member." Dkt. 75 Ex. N.

**D.      Weiss Sends A Demand Letter.**

During the balance of November 2021, the Company and Coinbase worked on the Potential Transaction. Weiss contends that he was excluded from large portions of those discussions.

By letter dated December 7, 2021, Weiss formally asked for information about the Potential Transaction in his capacity as a director. *See* Dkt. 34 Ex. D. Among other items, he requested:

- All documents reflecting the negotiations between the Company and Coinbase.

- All documents reflecting the prospective employment, consulting, or other arrangements between the Company's current officers and directors and any Coinbase representatives.

- All documents relating to any unique benefit that any of the Company's current officers and directors would receive as a result of the Potential Transaction.

7

- All documents related to the Company or Board's consideration of hiring an investment banker or financial advisor to assist the Company or Board in connection with the Potential Transaction.

- All documents reflecting any evaluation or consideration of any merger, sale, or asset disposition involving the Company since January 1, 2021.

- All documents reflecting any valuation of the Company's capital stock since January 1, 2021.

- All documents relating to any proposed debt or equity financing transaction since January 1, 2021.

- All projections or forecasts, including drafts, prepared by members of the Company's management since January 1, 2021, irrespective of whether they were submitted to the Board.

*Id.*

Brady and Lewis knew that Coinbase wanted the Board to provide a unanimous recommendation in favor of the sale of the Company. They viewed Weiss as a problem, and they had been working with a group of preferred stockholders to remove Weiss. On December 8, 2021, one day after Weiss sent his demand letter, holders of a majority of the Company's preferred stock acted by written consent to remove Weiss from the Board. *See* Dkt. 43 Ex. F. The Company informed Weiss that his books and records request was "no longer relevant" because he was no longer a director. Dkt. 43 Ex. H.

**E.    The Merger Closes.**

On January 11, 2022, the Board unanimously approved a merger between the Company and Coinbase (the "Merger"). The Company subsequently sent the Funds a package of documents that included a Confidential Information Statement, a Notice of Action by Written Consent Without a Meeting Pursuant to Section 228 of the Delaware

8

General Corporation Law (the "DGCL"), and a Notice of Statutory Appraisal Rights Under Section 262 of the DGCL, all dated as of January 25, 2022.

The Merger closed on February 1, 2022. The Company merged with a limited liability company wholly owned by Coinbase. The latter emerged from the Merger as the surviving company.

### F.    The Appraisal Proceeding And The Discovery Dispute

On February 3, 2022, the Funds demanded an appraisal of their shares. The Funds subsequently commenced this appraisal proceeding.

In discovery, the Company asserted the attorney-client privilege for materials prepared during Weiss's tenure as a director. DLA Piper echoed the Company's objections. The Company and DLA Piper refused to produce the materials.

The Company also went on offense. Believing that the Funds possessed privileged material that they had received from Weiss during his tenure, the Company instructed the Funds to destroy the information.

After efforts to resolve the dispute failed, the Funds filed a motion to compel. The Company filed an opposition and a cross-motion to compel the Funds to destroy any privileged material that they possess.

## II.    LEGAL ANALYSIS

Court of Chancery Rule 26(b) governs the scope of discovery. Under Rule 26(b)(1):

> Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, including the existence, description, nature, custody, condition and

9

location of any documents, electronically stored information, or tangible things and the identity and location of persons having knowledge of any discoverable matter.

No one disputes that the Funds seek relevant information. The Company argues that it can withhold the information because discovery only extends to "non-privileged matter."

Delaware has codified the attorney-client privilege. Rule of Evidence 502(b) provides as follows:

> A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client (1) between the client or the client's representative and the client's lawyer or the lawyer's representative, (2) between the lawyer and the lawyer's representative, (3) by the client or the client's representative or the client's lawyer or a representative of the lawyer to a lawyer or a representative of a lawyer representing another in a matter of common interest, (4) between representatives of the client or between the client and a representative of the client, or (5) among lawyers and their representatives representing the same client.

D.R.E. 502(b). "Paraphrasing the language of D.R.E. 502(b), the privilege extends to a (1) communication, (2) which is confidential, (3) which was made for the purpose of facilitating the rendition of professional legal services to the client, (4) between the client and it's attorney." *Deutsch v. Cogan*, 580 A.2d 100, 104 (Del. Ch. 1990) (cleaned up). "The burden of proving that the privilege applies to a particular communication is on the party asserting the privilege." *Moyer v. Moyer*, 602 A.2d 68, 72 (Del. 1992). The current dispute turns on the element of confidentiality.

## A.     Delaware's Longstanding Approach: The Joint Client Rule

A director's ability to access corporate information affects whether a corporation can claim that a communication was confidential as to the director and thereby invoke the

10

attorney-client privilege. A director's right to information is "essentially unfettered in nature," and that right includes access to privileged material.[2] "Directors of Delaware corporations are generally entitled to share in legal advice the corporation receives." *In re WeWork Litig.*, 250 A.3d 901, 908 (Del. Ch. 2020). The rationale for this rule is that "all directors are responsible for the proper management of the corporation, and thus, should be treated as a 'joint client'—'not in his or her individual capacity, but as a member of the collective body'—when legal advice is rendered to the corporation through one of its officers or directors." 1 Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 7.02[d], 7-46 (2d ed. 2021) (footnote omitted); *accord Moore Bus. Forms, Inc. v. Cordant Hldgs. Corp.*, 1996 WL 307444, at *4 & n.4 (Del. Ch. June 4, 1996) (explaining joint client principle); *Kirby v. Kirby*, 1987 WL 14862, at *7 (Del. Ch. July 29, 1987) (same).

Because the corporation has no expectation of confidentiality as to a director, the general rule is that "a corporation cannot assert the privilege to deny a director access to legal advice furnished to the board during the director's tenure." *Moore Bus. Forms*, 1996 WL 307444, at *4; *see id.* at *6 ("Mr. Rogers was a member of that board, having the same status as the other directors. No basis exists to assert the privilege against him . . . .").

---

[2] *Schoon v. Troy Corp.*, 2006 WL 1851481, at *1 n.8 (Del. Ch. June 27, 2006) (quoting *Milstein v. DEC Ins. Brokerage Corp.*, C.A. Nos. 17586, 17587, at 3 (Del. Ch. Feb. 1, 2000) (TRANSCRIPT); *accord Intrieri v. Avatex*, 1998 WL 326608, at *1 (Del. Ch. June 12, 1998); *Belloise v. Health Mgmt., Inc.*, 1996 Del. Ch. LEXIS 127, at *36 (Del. Ch. June 11, 1996) (Allen, C.).

The fact that directors function as joint clients with each other and the corporation means that the expectation of confidentiality that is essential to invoking the privilege does not exist among the joint clients. "On the matters of common interest upon which [joint clients] sought the attorney's assistance, none can have a reasonable expectation of confidentiality relative to the other clients for his communications with the shared attorney . . . ." 1 Paul R. Rice, *Attorney-Client Privilege In The United States* § 4:33, Westlaw (database updated Dec. 2022). The Delaware Rules of Evidence address this point expressly by stating that "there is no privilege . . . [a]s to a communication relevant to a matter of common interest between or among 2 or more clients if the communication was made by any of them to a lawyer retained or consulted in common, when offered in an action between or among any of the clients." D.R.E. 502(d)(6). Rule 502 defines the "client" for purposes of the rule as "without limitation, officers, *directors*, and employees of (a) any business entity that is organized under the laws of this State, and (b) any business entity organized under the laws of any nation other than the United States that owns or controls a business entity that is organized under the laws of this State." D.R.E. 502(a)(1) (emphasis added).

When a joint client relationship terminates, the absence of confidentiality that is essential to the privilege does not change. During their tenure, all directors sit with the corporation inside the circle of confidentiality, and the corporation therefore cannot invoke the attorney-client privilege against any of the directors. When a director's tenure ends, the director leaves the circle of confidentiality for purposes of any subsequent communications, but that does not retroactively alter the fact that the director was within

12

the circle of confidentiality for purposes of communications during his tenure. For materials prepared during the director's term, the corporation has no expectation of confidentiality and cannot assert the privilege against the director.

## 1. *Kirby*

The joint client approach is nothing new. Justice Berger, then a Vice Chancellor, adopted the approach nearly forty years ago in *Kirby v. Kirby*, 1987 WL 14862 (Del. Ch. July 29, 1987). There, four siblings served as directors of a closely held, nonstock corporation. One of the four siblings was named sole member of the corporation after their father's death. Thirteen years later, three of the siblings learned that the sole member had named his wife and children as additional members of the corporation. The three siblings acted at the board level to amend the bylaws to provide that only directors could be members. The member-sibling responded at the member level by removing the other siblings from the board. The three siblings filed an action under Section 225 of the DGCL in which they asked this court to determine that they remained directors of the corporation.

During discovery, the removed directors sought the production of documents generated before their removal that the corporation had withheld on the basis of the attorney-client privilege. Although the former directors challenged the validity of their removal, Justice Berger analyzed the question as if the directors had been removed. She granted the motion on the grounds that the removed directors were joint clients with the corporation and their sibling director for purposes of privileged material created during their tenure, reasoning as follows:

13

> As to those documents prepared prior to [the plaintiffs' removal], I am not persuaded that the attorney-client privilege may be invoked against plaintiffs. The issue is not whether the documents are privileged or whether plaintiffs have shown sufficient cause to override the privilege. Rather, the issue is whether the directors, collectively, were the client at the time the legal advice was given. Defendants offer no basis on which to find otherwise, and I am aware of none. The directors are all responsible for the proper management of the corporation, and it seems consistent with their joint obligations that they be treated as the "joint client" when legal advice is rendered to the corporation through one of its officers or directors.

*Id.* at *7. Because the directors were joint clients, the corporation had no expectation of confidentiality as to the removed directors and could not invoke the attorney-client privilege to withhold documents created during their tenure. *Id.*

### 2. *AOC Limited Partnership*

The next significant decision in Delaware's application of the joint client approach came approximately five years later when then-Vice Chancellor Chandler issued his decision in *AOC Limited Partnership v. Horsham Corp.*, 1992 WL 97220 (Del. Ch. May 5, 1992). The corporation at the heart of the dispute was Clark Oil & Refining Corp., a wholly owned subsidiary of AOC Holdings, Inc. ("Holdings"). Two entities jointly owned Holdings: Horsham Corp., with a controlling 60% interest, and AOC Limited Partnership (the "AOC Fund"), with the remaining 40%. Paul A. Novelly and Samuel R. Goldstein indirectly owned 100% of the AOC Fund, and Peter Munk held 83.1% voting control of Horsham. Novelly, Goldstein, Munk, and two unaffiliated individuals comprised the board of Clark Oil.

After the board discussed a potential initial public offering of Clark Oil's equity, the AOC Fund sued to enforce a stockholders agreement with Horsham and Holdings and

14

also asserted a claim for breach of fiduciary duty against Horsham, Munk, and the two unaffiliated directors. Mayer Brown & Platt ("Mayer") had represented Clark Oil and the board, and during discovery, the AOC Fund sought production of purportedly privileged communications. The court held that the defendants could not invoke privilege to prevent the AOC Fund from accessing the purportedly privileged material:

> Clark Oil is a client of [Mayer]. Plaintiff [the AOC Fund], in effect, is a member of Clark Oil's board since its two constituents are members of its board. Therefore, plaintiff is just as much the "client" of Mayer as defendants are. Thus, they should have access to the same information to which the defendants have access with respect to legal advice given to Clark Oil.

*Id..* at *1. Put differently, Clark Oil had no expectation of confidentiality as to its directors, including Novelly and Goldstein. Because Novelly and Goldstein managed the AOC Fund, they necessarily shared information with the fund as human beings who could not partition their brains. Clark Oil therefore had no expectation of confidentiality as to the AOC Fund either, and the defendants could not invoke the attorney-client privilege to withhold advice provided to the Clark Oil board.

### 3. *Moore Business Forms*

After another five years, the next landmark decision on the joint client approach arrived when Justice Jacobs, then serving as a Vice Chancellor, issued his decision in *Moore Business Forms, Inc. v. Cordant Holdings Corp.*, 1996 WL 307444 (Del. Ch. June 4, 1996). The plaintiff (Moore) had financed a management buyout that was implemented through the defendant, Cordant Holdings Corp. ("Holdings"). Moore purchased shares of Holdings preferred stock, and Moore and Holdings entered into a stockholders agreement

15

that gave Moore the right to designate a director on the Holdings board. After Moore rejected an offer from Holdings to repurchase its shares, the Holdings board began excluding Moore's designee from its deliberations about the repurchase. When litigation ensued, Moore sought to compel production of the materials that the other directors received. *Moore Bus. Forms*, 1996 WL 307444, at \*4.

Relying on *Kirby*, Justice Jacobs held that Moore's designee was a joint client with his fellow directors and Holdings. Justice Jacobs explained that because directors are joint clients with the corporation, the corporation has no expectation of confidentiality as to the director designee and "cannot assert the [attorney-client] privilege to deny a director access to legal advice furnished to the board during the director's tenure." *Id.* at \*4. Elaborating on *Kirby*'s rationale, Justice Jacobs explained that

> [a]lthough the *Kirby* Court described the directors as a "joint client," a more accurate description of the relationship is that there was a single "client," namely, the entire board, which includes all its members. That is, a director seeking information furnished to the board that is the subject of the privilege claim is a "client" not in his or her individual capacity, but as a member of the collective body (the board) of which the director is one member.

*Id.* at \*4 n.4. That clarification does not change the fact that the corporation has no expectation of confidentiality as to the entire board, including all of its members. Justice Jacobs' reference to the "collective body (the board) of which the director is one member" explains *why* the directors are within the circle of confidentiality for purposes of the joint client rule.

Justice Jacobs next discussed two ways a corporation could create an expectation of confidentiality as to a director that would support an assertion of privilege. One way

16

was through "an *ex ante* agreement among the contracting parties." *Id.* at *5. Today, corporations commonly enter into confidentiality agreements to address the use of information, with particular emphasis on information sharing.

A second way to create the necessary expectation of confidentiality was for the board to act "pursuant to 8 *Del. C.* § 141(c) and openly with the knowledge of [the excluded director], to appoint a special committee." *Id.* at *6. Having done so, the committee is "free to retain separate legal counsel," and its communications with counsel are "properly protected" to the extent necessary for the committee's ongoing work. *Id.*

In *Moore Business Forms*, Holdings had not established an expectation of confidentiality using either method. Moore's designee was therefore within the circle of confidentiality as a joint client, and Holdings could not invoke the attorney-client privilege against him.

Finally, Justice Jacobs addressed whether it made any difference that the plaintiff in the lawsuit was Moore, the stockholder that had exercised a right to appoint the director designee, rather than the director himself (Rogers). Justice Jacobs saw no distinction between the two:

> The relationship between Moore and Holdings is defined by the Stockholders' Agreement. Mr. Rogers' position as a Holdings director derived entirely from his status as Moore's designee pursuant to that Agreement. All parties understood that Mr. Rogers would be acting as Moore's representative on the Holdings Board and that his tenure as a director would be at Moore's pleasure. The Stockholders Agreement cannot reasonably be construed otherwise. Nothing in the Stockholders Agreement precludes Moore from receiving any information imparted to Mr. Rogers. It therefore follows that if Mr. Rogers was entitled to the disputed communications by virtue of his position as a Holdings director, then

17

Moore would also be entitled to these communications by virtue of the Stockholders' Agreement.

*Id.* at *4. The ability of the stockholder to obtain discovery in the litigation with Holdings therefore turned on and was co-extensive with "Mr. Rogers' information rights as a director of Holdings." *Id.*

In holding that Holdings could not more invoke privilege against Moore than it could against Moore's designee, Vice Chancellor Jacobs relied on the *AOC* case, describing the situation in *Moore Business Forms* as "strongly analogous to *AOC*." *Id.* at *5. The outcome in *Moore Business Forms* did not turn on a contractual right to information in the Stockholders Agreement, but rather on the fact that Moore could appoint a designee and was presumed to share information with its designee, just as the AOC Fund and its representatives on the Clark Oil board were presumed to share information. That in turn meant that Holdings had no expectation of confidentiality as to Moore and could not assert the attorney-client privilege.

**4. *SBC Interactive***

One year after *Moore Business Forms*, while still serving as a Vice Chancellor, Justice Jacobs returned to the joint client regime in *SBC Interactive, Inc. v. Corporate Media Partners*, 1997 WL 770715 (Del. Ch. Dec. 9, 1997). The plaintiff (SBC) was a partner in a Delaware general partnership. After SBC gave formal notice of its intent to exercise a contractual withdrawal right, the partnership's in-house counsel contacted SBC's outside counsel and instructed that any communications about the withdrawal be routed to him. Afterward, the other partners consulted with the partnership's general

18

counsel about their rights and obligations. Litigation ensued over the withdrawal, and SBC moved to compel production of privileged communications created before the service of its withdrawal notice.

Applying the joint client framework, Justice Jacobs held that SBC could not have thought that it had an attorney-client relationship with the partnership's in-house counsel for purposes of the exercise of its withdrawal right because as soon as SBC served the withdrawal notice, its interests and the partnership's became adverse. *Id.* at \*4. The court distinguished *Moore Business Forms* as a situation where advice was given "before any open dispute had arisen, under circumstances where the director being excluded from access to that advice had a reasonable expectation that he was a client of the board's counsel, having the same information access rights as the other board members." *Id.* at \*5. Under those circumstances, the corporation had no expectation of confidentiality as to the director, and the corporation could not assert the attorney-client privilege. *Id.* at \*6.

In *SBC Interactive*, however, the partnership put the partner on notice that the partnership viewed its interests as adverse. After the dispute arose, the partnership's counsel asked for all communications to be routed through him, making clear that the partner was outside the circle of confidentiality. Once the partnership's counsel took that step, the partner could no longer have a reasonable expectation that it was a joint client of the partnership's in-house counsel. Having excluded the partner from the circle of confidentiality, the partnership could invoke privilege as to advice regarding the withdrawal right. *See id.* at \*6.

19

The *SBC Interactive* decision established a third method by which a corporation can establish the expectation of confidentiality necessary to invoke privilege under the joint client paradigm. If the corporation puts the director on notice that an adversity of interests exists, then the director cannot expect to be within the circle of confidentiality as to those matters. At that point, the director can either accept the situation and obtain separate counsel or challenge the corporation's position by asserting a right to information under Section 220(d) of the DGCL, which gives sitting directors a presumptive right to obtain information from the corporation. 8 *Del. C.* § 220(d).

**5.      The Consistent Application Of The Joint Client Approach**

Over the past quarter century, the principles articulated in *Kirby*, *AOC*, *Moore Business Forms*, and *SBC Interactive* have governed the ability of a corporation to invoke privilege against a director and an affiliated stockholder. A series of written decisions, as well as numerous transcript rulings, have applied the joint client approach.

One example is *Kalisman v. Friedman*, 2013 WL 1668205 (Del. Ch. Apr 17, 2013). The plaintiff, Jason Taubman Kalisman, was a director of Morgans Hotel Group Co. *Id.* at *1. Kalisman also was a founding member of OTK Associates, LLC, the company's largest stockholder. After OTK announced that it would nominate candidates for election and present items of business at the company's annual meeting, the other directors began meeting in secret to consider strategic alternatives. They concealed their activities from Kalisman, and "[w]hen he asked for information, he was told nothing was in the works." *Id.* Kalisman only learned the truth when company counsel notified him

20

that the board would meet the next day to consider and approve a recapitalization of the company. The email attached eleven documents spanning hundreds of pages. *Id.*

Kalisman filed suit against his fellow directors. When the defendants sought to assert the attorney-client privilege against him, Kalisman moved to compel. Following *Kirby* and *Moore Business Forms*, the court held that Kalisman was a joint client with the corporation and his fellow directors, which meant he was entitled to receive the same information they received and that the corporation had no expectation of confidentiality against him. *Id.* at \*6. The court then analyzed whether any of the three exceptions recognized in *Moore Business Forms* and *SBC Interactive* applied to the case. There was no *ex ante* agreement, the board had not put Kalisman on notice that the board viewed his interests as adverse on any subject, and the board had not taken formal steps to establish an expectation of confidentiality as to Kalisman until March 20, 2013, when a committee on which Kalisman served formed a subcommittee that excluded him. *Id.* at \*4–5. The court held that as to events prior to March 20, the corporation had no expectation of confidentiality as to Kalisman and could not assert the attorney-client privilege against him. The court also observed that the defendants were not well-positioned to invoke privilege against OTK, the entity Kalisman represented, because "[w]hen a director serves as the designee of a stockholder on the board, and when it is understood that the director acts as the stockholder's representative, then the stockholder is generally entitled to the same information as the director." *Id.* at \*6 (citing *Moore Bus. Forms*, 1996 WL 307444, at \*4).

21

A more recent example is *In re CBS Corp. Litigation*, 2018 WL 3414163 (Del. Ch. July 13, 2018). There, a controlling stockholder and its affiliated directors sought to obtain a broad ruling at the beginning of discovery that would prevent the corporation from asserting the attorney-client privilege against them. Summarizing the principles articulated in *Kirby*, *Moore Business Forms*, and *SBC Interactive*, Chancellor Bouchard explained that the directors affiliated with the controlling stockholder were joint clients with their fellow directors and the corporation such that the corporation had no expectation of confidentiality against them and could not invoke privilege. *CBS*, 2018 WL 3414163, at *4–5.

Following precedent, Chancellor Bouchard held that the controlling stockholder could receive the same discovery as its director designees, noting that one of the director designees controlled the controlling stockholder, and it was "simply not realistic or practical to believe that any information to which she may become privy as a result of this ruling could be segregated from her thought process as an adversary of CBS in this case." *Id.* In other words, she only had one brain, and she could not avoid sharing information with the entity she controlled, which was permissible under the weight of precedent. *Id.* Chancellor Bouchard also followed precedent in holding that two special committees formed by the board had established an expectation of confidentiality as to the controlling stockholder and its affiliated directors such that they could assert privilege as to matters falling within their purview. *Id.* at *7. Otherwise, he declined to make broad rulings about privilege, noting that there were periods when adversity had existed

22

between the corporation and the controlling stockholder and its designees that could be sufficient to support the assertion of privilege under *SBC Interactive*.

An even more recent example is *In re WeWork Litigation*, 250 A.3d 901 (Del. Ch. 2020). There, a corporation's management team sought to preclude a director from obtaining production of the corporation's privileged information. *Id.* at 910. Applying the joint client approach, Chancellor Bouchard held that "directors of a Delaware corporation are presumptively entitled to obtain the corporation's privileged information as a joint client of the corporation." *Id.* at 911. He rejected the notion that senior management could invoke the privilege against a sitting director. *Id.*

*Kalisman*, *CBS*, and *WeWork* are but three of the many decisions that have applied the joint client approach and considered whether a corporation had a sufficient expectation of confidentiality to invoke the attorney-client privilege against a director.[3]

_____

[3] *E.g.*, *Police & Fire Ret. Sys. of City of Detroit v. Musk*, 2023 WL 1525022, at *2 n.21 (Del. Ch. Jan. 31, 2023) ("[D]irectors are treated as joint clients with the corporations they run . . . ."); *In re Aerojet Rocketdyne Hldgs., Inc.*, 2022 WL 1446782, at *5 (Del. Ch. May 5, 2022) (finding one faction of the board suing another faction had "no greater claim to the Company's privilege" because each faction was a joint client with the Company); *Buttonwood Tree Value P'rs, L.P. v. R. L. Polk & Co., Inc.*, 2021 WL 3237114, at *8 (Del. Ch. July 30, 2021) (subsequent history omitted) ("In recognition of the reality that a corporation may only assert the privilege through its agents, *i.e.*, its officers and directors, legal advice rendered to the corporation through one of its officers or directors is typically privileged as though given to a 'joint client.'" (cleaned up)); *Schnatter v. Papa John's Int'l, Inc.*, 2019 WL 939205, at *1 (Del. Ch. Feb. 25, 2019) (same). Other cases apply the framework established in *Kirby*, *Moore Business Forms*, and *SBC Interactive* by looking to see if one of the exceptions to the joint client rule exists. *E.g.*, *Bruckel v. TAUC Hldgs., LLC*, 2023 WL 116483, at *4 (Del. Ch. Jan. 6, 2023); *In re Howard Midstream Energy P'rs, LLC*, 2021 WL 4314111, at *2 (Del. Ch. Sept. 22, 2021); *Pearl City Elevator, Inc. v. Gieseke*, 2020 WL 5640268, at *2 (Del. Ch.

Numerous decisions have also considered whether a corporation can invoke privilege against a stockholder affiliated with a director in light of the expectation that a director acting as a stockholder's designee will share information with the stockholder, as well as the practical reality that sharing necessarily occurs when a single person acts in a dual role.[4] This framework has been settled law in Delaware for nearly four decades.

### 6. The Joint Client Approach Applied To This Case

Under the joint client approach, the Company cannot assert the attorney-client privilege to withhold information generated while Weiss was a director. During his tenure, Weiss, the other members of the Board, and the Company were joint clients. Weiss was therefore within the circle of confidentiality for purposes of privilege. The Company had no expectation of confidentiality as to Weiss, and the Company cannot assert privilege against him or his affiliates.

---

Sept. 21, 2020); *Lynch v. Gonzalez*, 2019 WL 6125223, at *10 (Del. Ch. Nov. 18, 2019); *Gilmore v. Turvo, Inc.*, 2019 WL 3937606, at *2 (Del. Ch. Aug. 19, 2019).

[4] *See In re Dole Food Co., Inc. S'holder Litig.*, 2015 WL 5052214, at *43–44 (Del. Ch. Aug. 27, 2015); *Kortum v. Webasto Sunroofs, Inc.*, 769 A.2d 113, 121 (Del. Ch. 2000); *KLM v. Checchi*, 1997 WL 525861, at *2–3 (Del. Ch. July 23, 1997); *see also Schoon v. Smith*, 953 A.2d 196, 208 (Del. 2008) (holding that director lacked standing to sue derivatively because stockholder he represented could bring suit, which only could happen if director was able to share information with affiliated stockholder). For discussions of the nuanced issues raised by information sharing and the difficulties of a bright-line rule that either permits or prohibits sharing, see J. Travis Laster & John Mark Zeberkiewicz, *The Rights and Duties of Blockholder Directors*, 70 Bus. Law. 33, 54–57 (2015); Cyril Moscow, *Director Confidentiality*, 74 L. & Contemp. Probs. 197 (2011); and Catherine G. Dearlove & Jennifer J. Barrett, *What To Do About Informational Conflicts Involving Designated Directors*, 57 Prac. Law. 45 (2011).

24

During his tenure as a director, Weiss received numerous communications from the Company and its counsel. DLA Piper communicated directly with Weiss and his fellow directors about the Merger. *See, e.g.*, Dkt. 75 Exs. N, O, P, Q. In an email dated as of November 8, 2021, DLA Piper expressly told Weiss that he was a joint client of the firm, stating: "I represent the board and shareholders of FairX, which includes your firm and you as a board member." Dkt. 75 Ex. N at '886. Weiss had a reasonable expectation that he was a joint client and within the circle of confidentiality for purposes of privilege.

After Weiss voiced his desire to retain an investment banker and explore alternatives to the Coinbase offer, the Company's management team and its counsel secretly began to exclude him from communications. Their efforts to withhold information did not alter his informational rights. Weiss remained inside the circle of confidentiality and had the right to receive all of the same information that was provided to his fellow directors.

The Company did not take any of the recognized steps that would have created an expectation of confidentiality as to Weiss and provided the factual predicate for asserting privilege. There was no *ex ante* agreement. The Board did not form a transaction committee. No one put Weiss on notice that his interests were adverse as to any topic. True, Weiss had the sense that he was getting the cold shoulder, and that led him to send a demand for information on December 7, 2021. He was removed the next day.

The Funds agree that Weiss became adverse to the Company when he sent his books and records request for purposes of the Company's response to his request, and they do not seek privileged communications concerning that request. The Funds agree

25

that Weiss no longer remained within the circle of confidentiality after his removal on December 8, and they accept that the Company can assert the attorney-client privilege against them from that point.

No one disputes that Weiss served on the Board as a representative of the Funds. Under *AOC*, *Moore Business Forms*, *Kalisman*, and *CBS*, Weiss had the right to share information with the Funds, and he necessarily shared information in light of his dual roles as director and fund manager. Having only one brain, Weiss could not avoid sharing information. The Funds were therefore inside the circle of confidentiality as well.

When former joint clients sue one another "the default rule is that all communications made in the course of the joint representation are discoverable." *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 366 (3d Cir. 2007) (applying Delaware law). In other words, "where an attorney jointly represents two clients who later become adversarial parties in litigation, one party cannot assert attorney-client privilege to avoid disclosure of communications which were made during the joint representation." *In re Sutton*, 1996 WL 659002, at *5 (Del. Super. Aug. 30, 1996). Delaware Rule of Evidence 502(d)(6) states that "there is no privilege . . . [a]s to a communication relevant to a matter of common interest between or among 2 or more clients if the communication was made by any of them to a lawyer retained or consulted in common, when offered in an action between or among any of the clients." Delaware Rule of Evidence 502(a)(1) defines the term "client" to include, without limitation, the "directors . . . of any business entity that is organized under the laws of this state."

26

Weiss and the Funds were within the circle of confidentiality. The fact that the Funds have now sought appraisal does not change the scope of the circle as it existed before December 8, 2021. The Company therefore cannot invoke the attorney-client privilege to withhold materials created between November 14, 2019, and December 8, 2021, during Weiss's tenure as a director, except that the Company can assert the attorney-client privilege for communications relating to Weiss's books-and-records request, after he sent it on December 7.

## B. The Company's Responses

Faced with these long-settled principles of law, the Company makes three arguments. First, the Company invokes a related but distinct body of law that governs how a transaction affects who can direct an entity to assert the attorney-client privilege. Second, the Company invokes the law governing Section 220(d) of the DGCL and seeks to apply it to discovery in a plenary action. Third, the Company contends that the Funds waived their ability to challenge the Company's invocation of privilege. None of those arguments succeed.

### 1. The Post-Merger Entity As The Successor To The Privilege

The Company first argues that as the surviving entity that resulted from the Merger, the Company succeeded to the constituent entities' rights to assert privilege. That is true, but the Company then leaps to the conclusion that because the merger agreement did not carve out any rights for former directors to access privileged information, the Company gained the right to invoke privilege against Weiss and the Funds. The second part is wrong.

27

When a corporation engages in a transformative transaction that divides or combines the corporate form—think of a spinoff, a sale of assets, or a merger—questions arise as to which entity controls the privilege. In a spinoff, does the privilege travel with the spun-off entity, or does it remain with the former parent? In a sale of assets, is the privilege an asset that the buyer acquires, or does the seller retain it? And in a merger, does the surviving corporation control the privilege?

For a merger, the answer is easy. Section 259(a) of the DGCL provides that when constituent corporations combine in a merger, "all property, rights, privileges, powers and franchises, and all and every other interest shall be thereafter as effectually the property of the surviving or resulting corporation." The statute uses the word "privileges," and this court has held that the plain language of that word encompasses the attorney-client privilege.[5]

---

[5] *Great Hill Equity P'rs IV, LP v. SIG Growth Equity Fund I, LLLP*, 80 A.3d 155, 158 (Del. Ch. 2013). I suspect that the plain language interpretation of the word "privilege" in *Great Hill* is anachronistic and that the concept of "privileges" as used in Section 259 refers to the rights, powers, and privileges that a corporation can exercise under the DGCL. Section 259 has a pedigree stretching back to the original enactment of the DGCL, and cases have consistently used the word "privileges" in that manner. *E.g.*, *Bubenzer v. Philadelphia, B. & W.R. Co.*, 61 A. 270, 275 (Del. Ch. 1905) (quoting 1903 version of DGCL which provided that following a consolidation, "the corporation created thereby shall be possessed of, exercise and enjoy all the rights, powers and privileges which this act confers upon consolidated companies; and it shall likewise be possessed of, exercise and enjoy all the franchises, rights, powers, privileges, immunities and benefits, which any corporation of this state constituent thereof was possessed of or was entitled to exercise under its charter or any law of this state"). Cases predating the DGCL used the concept of "privileges" in the same way to refer to what the corporation's special charter authorized it to do. *See State v. Bank of Smyrna*, 7 Del. 99, 110 (Ct. App. & Err. 1859) (noting that a canal company "was authorized by a supplement to its original charter to extend its canal subject to the same rights, powers and privileges as

contained in its original charter. By the original charter the Company was exempted from taxation and it was held that under the term *privileges*, the exemption extended to the new part, or the extension of the canal"); *Swift v. Richardson*, 32 A. 143, 144 (Del. Super. Ct. 1886) ("Corporations are created, and their rights, powers, and privileges are granted, for the public good."). Other authorities likewise use the word "privileges" to refer to legal rights, such as a right associated with and exercisable by the owner of a share of stock. *See, e.g.*, *Adams v. Clearance Corp.*, 121 A.2d 302, 305 (Del. 1956) (noting Section 123 of the DGCL granted a corporation the power to own the stock of another and to "exercise all the rights, powers and privileges of ownership including the right to vote thereon"); *Phillips v. Insituform of N. Am., Inc.*, 1987 WL 16285, at *2 (Del. Ch. Aug. 27, 1987) ("INA's common stock is of two classes. The rights, powers and privileges of each class are identical except that the holders of Class B are entitled to elect 2/3 of the board of directors of the Company."); *Aldridge v. Franco Wyo. Oil. Co.*, 7 A.2d 753, 765 (Del. Ch. 1939) (interpreting charter provision that referred to a corporation having the ability "to exercise all the rights, powers and privileges of ownership" of stock, "including the right to vote thereon" and citing similar language in the 1935 version of the DGCL); *Philadelphia, Wilmington & B.R. Co. v. Kent Cnty. R. Co.*, 1875 WL 1949, at *2 (Del. Super. Ct. 1875) (noting that corporation crated under Maryland law was given the authority to "exercise and enjoy all the rights, powers, and privileges properly appertaining to the" the purchasing and holding, leasing, mortgaging, and selling of real estate); *see also State ex. Re. James v. Schorr*, 65 A.2d 810, 823 (Del. 1948) (citing act creating Department of Elections and noting that it gave the department the power to exercise "such other rights, powers and privileges as by this Act conferred"). A more familiar use of the term "privileges" that deploys the word in similar fashion appears in the Privileges or Immunities Clause of the United States Constitution, which provides that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." U.S. Const. amend. XIV, § 1. The parallel is unsurprising, as the drafters of the United States Constitution drew on precedents that included the corporate charters used to establish the colonies, and the foundational document bears striking similarities to a corporate charter. *See, e.g.*, John Mikhail, *Is the Constitution a Power of Attorney or a Corporate Charter? A Commentary on* "A Great Power of Attorney": Understanding the Fiduciary Constitution *by Gary Lawson and Guy Seidman*, 17 Geo. J. L. & Pub. Pol. 407 (2019); David Ciepley, *Is The U.S. Government a Corporation? The Corporate Origins of Modern Constitutionalism*, 111 Am. Pol. Sci. R. 418 (2017); John Mikhail, *The Necessary and Proper Clauses*, 102 Geo. L.J. 1045 (2014). But while I quibble with *Great Hill*'s plain meaning interpretation of the word "privileges," I concur with the outcome of the case. To avoid the anachronism, I would have introduced an additional analytical step and held that the right to assert privilege is a

Because any privilege that a constituent company held before the merger passes to the surviving company, parties must contract for a different outcome. "Absent . . . an express carve out, the privilege over all pre-merger communications—including those relating to the negotiation of the merger itself—passe[s] to the surviving corporation in the merger, by plain operation of clear Delaware statutory law under § 259 of the DGCL." *Great Hill*, 80 A.3d at 162.

The Company seeks to use the law governing which entity holds the privilege to argue that the Merger divested Weiss of his status as a former joint client and deprived him of his ability to obtain privileged information. The former body of law answers a different question: What entity controls the privilege to the extent the entity has the right to invoke it? The latter question turns on the scope of the privilege and the fact that the director as a former client was within the circle of confidentiality. *Cf. McKee v. Specialty Benefits LLC*, C.A. No. 2019-0646-JTL, at 39–40 (Del. Ch. Sep. 10, 2020) (TRANSCRIPT) ("[W]e're conceptually talking about . . . whether privilege can be validly invoked in litigation where the documents are responsive in litigation and it is someone who previously was a sender, a recipient, or a copy recipient, et cetera, of the document, and hence the document was, by definition, not confidential as to them. I view the allocation of rights in the agreement as dealing with a separate concept that isn't

---

"right" or "power" of the constituent corporations that passes to the surviving corporation under Section 259. The endpoint is the same.

30

implicated here."). Section 259 provides that the surviving corporation gains the right to invoke privilege to the same degree as the constituent corporations. Section 259 does not create an expanded right that goes beyond the rights that a constituent corporation possessed.

In this case, the ability of the Company as the surviving entity to invoke privilege against Weiss after the Merger is no greater than the ability of the Company as a constituent entity to invoke privilege against Weiss before the Merger. For the reasons already discussed, Weiss was within the circle of confidentiality during his tenure on the Board, and thus, the Company cannot invoke the attorney-client privilege to withhold information generated during that period. The same is true for the Company as the surviving entity that succeeded to the Company's privilege under Section 259.

The Merger did not give the Company any greater rights than it possessed before the Merger. The Company's first argument for invoking privilege therefore fails.

### 2. The Attempt To Rely On Section 220(d)

In its second argument, the Company focuses on Weiss's status as a former director and argues that because his tenure ended, Weiss can no longer obtain privileged information from the corporation. In making this argument, the Company improperly takes principles that govern a director's request for information under Section 220(d) and attempts to apply them to civil discovery.

#### a. The Company's Reliance On Section 220(d) Precedent

To advance its argument that a corporation can treat a former director like any other outsider once the director's tenure ends, the Company relies on cases interpreting

31

Section 220(d). That statute provides that "[a]ny director shall have the right to examine the corporation's stock ledger, a list of its stockholders and its other books and records for a purpose reasonably related to the director's position as a director." 8 *Del. C.* § 220(d). Delaware cases hold that because the statute uses the term "director," it only grants rights to a current director. *See, e.g.*, *Prokupek v. Consumer Cap. P'rs LLC*, 2014 WL 7452205, at *6 (Del. Ch. Dec. 30, 2014). Delaware cases also hold that because the statute only authorizes a director to access materials "for a purpose reasonably related to the director's position as a director," a director cannot use Section 220(d) if the corporation proves that the primary purpose for the inspection is unrelated to the director's duties. Applying this standard, this court has held that a director would not be permitted to use section 220(d) to conduct "back-door discovery" on a personal claim.[6]

The Company argues that the same principles govern a director's efforts to obtain discovery in litigation, such that the director must be pursuing the litigation as a fiduciary to be able to access privileged information. The upshot of the Company's approach is that

---

[6] *Henshaw v. Am. Cement Corp.*, 252 A.2d 125, 130 (Del. Ch. 1969) (declining to permit a director to use Section 220(d) as a method for "back-door discovery unbound by work-product, privilege or any other limitation upon discovery"); *see Chappell v. FCB I Hldgs. Inc.*, C.A. No. 8817-VCP, at 8–9 (Aug. 28, 2013) (TRANSCRIPT) (following *Henshaw* in holding that director could not use litigation attorneys from personal litigation to obtain information under Section 220(d)); *Gunther v. 5iSciences, Inc.*, C.A. No. 5800-CC, at 4–6 (Dec. 3, 2010) (TRANSCRIPT) (rejecting effort of current director to obtain records under Section 220(d) where the request was "excessive" and director made the request for the benefit of his venture capital firm that was an investor in and wanted to acquire the corporation, creating a clear conflict of interest).

a former director cannot obtain privileged information created during his tenure through discovery in litigation, because the former director no longer acts in a fiduciary capacity.

In taking these positions, the Company recycles arguments that Justice Berger rejected nearly forty years ago in *Kirby*. After removing his three siblings from the board, the member-director in *Kirby* argued that his siblings lost any right to access information under Section 220(d). The court disagreed, explaining that "[p]laintiffs' rights under [Section] 220, whatever they may be, are irrelevant. Plaintiffs are seeking discovery in support of a colorable claim and are entitled to the documents unless they are protected from disclosure by a valid claim of privilege." *Id.* at *7. Justice Berger thus recognized that a director's ability to access information under Section 220(d) flows from the statutory language. A party's ability to obtain discovery in litigation is governed by the Court of Chancery Rules, including Rule 26. The former does not affect the latter.

Since *Kirby*, this court has applied the discovery rules to discovery and the language of Section 220(d) to Section 220(d) actions. The court has likewise rejected a converse attempt by a former director to apply the discovery rules to a Section 220(d) action. When a former director argued that he had standing to invoke informational rights under Section 220(d) because of language in *Kirby* and *Moore Business Forms*, the court explained that the plaintiff's position "erroneously conflates a director's right to access corporate books and records under Section 220(d) with a director's or former director's right to discovery of corporate documents when he personally is involved in litigation either as a plaintiff or a defendant." *King v. DAG SPE Managing Member, Inc.*, 2013 WL 6870348, at *9 (Del. Ch. Dec. 23, 2013). Pointing out that "[t]he two procedures are

separate and distinct," the court explained that in *Kirby* and *Moore Business Forms*, "the former directors in [discovery disputes] were pursuing or defending substantive claims and, as litigants in that context, had the right to pursue discovery under the applicable court rules." *Id.* at *7, *9. Those cases did not apply to a Section 220(d) action, just as the law of Section 220(d) did not apply to discovery.

As in *Kirby* and *King*, the issue in this case is not whether Weiss, as a former director, can obtain information under Section 220(d). The question is whether the Company can withhold discovery from the Funds by invoking privilege even though Weiss and the Funds were within the circle of confidentiality when the materials were created. The Company's Section 220(d) cases are inapposite. The motion to compel is governed by Rule 26, with the privilege questions governed by *Kirby* and its progeny.

### b. The Company's Reliance On *SerVaas*

The Company next fixates on a case that it interprets as applying Section 220(d)-style considerations to a discovery dispute. In *SerVaas v. Ford Smart Mobility LLC*, 2021 WL 5226487 (Del. Ch. Nov. 9, 2021), this court issued a letter ruling that reached a logical result on the facts presented. The decision did not purport to change the law or depart from the joint client approach. Yet the Company construes the decision as contemplating a fundamental reorientation of Delaware law regarding how a director can access information. That is not how I read *SerVaas*, nor is the Company's reliance on that decision persuasive.

The plaintiffs in *SerVaas* were former executives who had served on the defendant entity's governing board. The two executives had sold their companies to the defendant

and had rights to deferred compensation related to those transactions. One month before their rights to the deferred compensation vested, the entity terminated the executives for cause, citing fraud and misappropriation. The executives sued for wrongful termination and, in discovery, sought access to the investigations on which the entity relied. After the entity invoked privilege, the executives moved to compel.

The court denied the motion. In the course of explaining its rationale, the court cited a series of considerations, namely that the executives (i) were "not acting to further the interests of [the companies] or their stockholders," (ii) were "not invoking their former fiduciary capacities in this action," (iii) did "not contend that the documents at issue would have allowed them to act as fully-informed directors," (iv) were "not claiming that certain documents were shared with other board members during their tenure but withheld from them," and (v) had no reason to believe that they were "'joint clients' of company counsel with regard to the issues." *Id.* at *4–5.

Discovery rulings—including rulings about privilege—require discretionary determinations based on the facts of the case. The *SerVaas* decision identified these considerations when making a discretionary decision. Yet as Company counsel conceded at oral argument, the Company interprets *SerVaas* as establishing a new regime in which a director's ability to access privileged information resembles a stockholder's qualified right to overcome privilege for good cause shown under *Garner v. Wolfinbarger*, 430

F.2d 1093 (5th Cir. 1970).[7] Like *Garner*, the Company's approach would allow the corporation to assert privilege, with the party requesting discovery having the burden to overcome the privilege by showing that various factors are present.

A *Garner*-style regime rests on a conceptual foundation that is categorically different from the joint client regime. Under *Garner*, the stockholder starts outside the circle of confidentiality, enabling the corporation to invoke privilege against the stockholder. By showing good cause under *Garner*, the stockholder can penetrate the privilege and gain access to otherwise confidential materials.

Under the joint client approach, the director starts inside the circle of confidentiality. Without the expectation of confidentiality on which privilege depends, the corporation cannot invoke the privilege against the director. Having started inside the circle, the director remains there unless and until excluded. Only for matters post-dating the director's tenure—or where the corporation follows one of the three acknowledged exceptions—is the director outside the circle of confidentiality. When it comes time for

---

[7] The *Garner* factors include: (1) the number of stockholders and the percentage of stock they represent; (2) the bona fides of the stockholders; (3) the nature of the stockholders' claim and whether it is obviously colorable; (4) the apparent necessity or desirability of the stockholders having the information and the availability of it from other sources; (5) whether, if the stockholders' claim is of wrongful action by the corporation, it is of action criminal, or illegal but not criminal, or of doubtful legality; (6) whether the communication is of advice concerning the litigation itself; (7) the extent to which the communication is identified versus the extent to which the stockholders are blindly fishing; the risk of revelation of trade secrets or other information in whose confidentiality the corporation has an interest for independent reasons. 430 F.2d at 1104.

discovery, there is no invasion of the privilege because the director starts on the inside and remains there, unless and until the corporation excludes him.

Under the joint client approach, confidentiality and privilege do not spring into being when the director's tenure ends. All that happens when the director's tenure ends is that the joint client relationship ends. That does not mean that one former joint client (the corporation) can now invoke privilege against another former joint client (the former director), any more than former joint clients can invoke privilege against each other in litigation between them. The rule is precisely the opposite: "There is no privilege . . . [a]s to a communication relevant to a matter of common interest between or among 2 or more clients if the communication was made by any of them to a lawyer retained or consulted in common, when offered in an action between or among any of the clients." D.R.E. 502(d)(6); *accord Sutton*, 1996 WL 659002, at *5 ("[W]here an attorney jointly represents two clients who later become adversarial parties in litigation, one party cannot assert attorney-client privilege to avoid disclosure of communications which were made during the joint representation.").

The Company's big-picture reading of *SerVaas* thus starts from a doctrinally flawed position. The Company fares no better when it tries to turn the fact-specific considerations that the *SerVaas* court identified into elements of a *Garner*-style test.

The Company interprets the first two considerations—whether the plaintiffs were acting to further the interests of the corporation or invoking their fiduciary capacities—as implicating concepts from Section 220(d). As discussed previously, Section 220(d) requires that a director pursue informational rights for a proper purpose, which means for

37

a purpose that would further the interests of the corporation or the director's fiduciary duties. If the corporation can show that the director is acting with an improper purpose, then the director cannot access information under Section 220(d).

As Justice Berger explained in *Kirby*, a former director who seeks to obtain information in discovery is not relying on Section 220(d). The source of the right to obtain information is the discovery rules themselves. The question is whether the corporation can invoke privilege to withhold information from discovery. That issue is governed by the law of privilege, including the effect of joint client status on the element of confidentiality. The rules governing access to information under Section 220(d) do not apply.

The closest analog to how the Company interprets these considerations is the exception to the joint client rule recognized in *SBC Interactive*. Under that exception, once a director is on notice of an adversity of interests, then the director cannot reasonably regard himself as a joint client of the corporation's counsel and within the circle of confidentiality. But the temporal framing under *SBC Interactive* differs from the Company's proposed regime.

The joint client approach looks at the facts and circumstances that existed when the privileged communication was made. If adversity did not exist, then the director is treated as a joint client who was within the circle of confidentiality such that the attorney-client privilege has no purchase. Focusing on the point when the attorney-client communication was made comports with the general principle that "[t]he existence of the attorney-client privilege . . . is determined as of the time the communication is made, not

38

at the time when discovery of the communication is sought." *Hoechst Celanese Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 623 A.2d 1118, 1123 (Del. Super. Ct. 1992). Under the Company's proposed test, the court would ask whether adversity exists at the time of the lawsuit in which the discovery is sought. If the director's lawsuit is adverse—and it typically will be—then the director cannot obtain the discovery. In taking that different view of adversity, the Company's proposed test resembles what one commentator describes as a separate approach to privilege, distinct from *Kirby*, which "focuses on whether the directors' interests are adverse to the corporation's." John W. Gergacz, *Attorney-Corporate Client Privilege* § 2:5, Westlaw (database updated Aug. 2022). Delaware does not follow that approach. Delaware follows *Kirby* and its progeny.

The Company attempts the same analytical move when it focuses on the reference in *SerVaas* to whether accessing the documents at issue would have allowed the plaintiffs to act as fully informed directors. As framed by the Company, that is another way of asking whether a director has a proper purpose for an inspection, which Section 220(d) requires. As the *Kirby* case explained, the issue in discovery is not access to information under Section 220(d), but rather whether a corporation can withhold discovery under Rule 26. When a party pursues discovery in a plenary lawsuit, a party generally is not seeking information to become fully informed as a director, but rather to litigate a case. A party can obtain relevant discovery in a civil case unless a valid claim of privilege exists. Whether the responding party can invoke privilege turns on the law of privilege, not principles under Section 220(d). If the requesting party was within the circle of confidentiality when the communication was created, then the responding party cannot

39

invoke privilege. A former director was within the circle of confidentiality for purposes of communications created during the director's tenure, so privilege is unavailable.

The Company thus attempts to use each of the first three case-specific considerations cited in *SerVaas* as means of injecting elements of the analysis under Section 220(d) into the separate context of civil discovery. That attempt fails.

The Company fares no better when it turns to the last two case-specific considerations that the *SerVaas* decision mentioned—whether the documents in question were shared with other board members but withheld from the plaintiff, and whether the director had reason to believe that he was a joint client of company counsel. The Company claims that unless a director can establish one or both of those factors, a director cannot overcome the privilege. Those considerations are indeed pertinent to whether a director was within the circle of confidentiality, but here—as with the entirety of its *Garner*-style analysis—the Company flips the burden of proof. Under *Kirby* and its progeny, a director starts within the circle of confidentiality as a joint client. The corporation resisting production must show that a situation existed sufficient to cut off joint client status and place the director outside the circle of confidentiality, such as sufficient adversity to have put the director on notice so that director knew or should have known that he could not rely on company counsel. Under the Company's approach, the burden rests on the director to identify factors that would enable the director to access the privilege information. For the factors that the Company draws from Section 220(d), that burden shift is also inconsistent with the statutory structure, which places the burden on the corporation to show that the director has an improper purpose. *See* 8 *Del. C.* § 220(d)

40

("The burden of proof shall be upon the corporation to establish that the inspection such director seeks is for an improper purpose.").

Although the Company claims to favor its proposed *Garner*-style framework, what the Company really wants is a rule where the ability to access information ceases when a director's tenure ends. At that point, as the Company's counsel conceded at oral argument, a former director by definition would not be able to claim that he needed the information in a fiduciary capacity or to become fully informed about his role. Dkt. 89 at 32. Such a rule would create problems for a former director who wants to rely on expert legal advice as a defense under Section 141(e) of the DGCL. *See* 8 *Del. C.* § 141(e) (providing that "a member of the board of directors . . . shall, in the performance of such member's duties, be fully protected in relying in good faith upon the records of the corporation and upon such information, opinions, reports or statements presented to the corporation by any of the corporation's officers or employees, or committees of the board of directors, or by any other person as to matters the member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the corporation."). The Company's stance continues to ignore the fact that the Court of Chancery Rules, including Rule 26, govern whether a party can obtain information in a civil proceeding. The question is not whether the former director has an independent right to obtain the information, such as under Section 220(d), but rather whether a corporation can invoke privilege to withhold information from someone against whom the corporation had no expectation of confidentiality.

41

Forced to search even further afield for support, the Company drew an analogy during oral argument to recent disputes involving former Presidents and Vice Presidents of the United States improperly retaining documents after their terms of office ended. Dkt. 89 at 21. The Company argued that just as a President or Vice President loses the ability to possess confidential information after leaving office, a former director likewise should lose the ability to conduct discovery into privileged material created during the director's tenure. The analogy falls short because the inability of Presidents and Vice Presidents to retain materials is a function of the Presidential Records Act, which provides that for materials created or received after January 20, 1981, the United States retains "complete ownership, possession, and control of Presidential records." 44 U.S.C. § 2202. Before the enactment of that statute, Presidents and Vice Presidents could and did retain official papers: "Beginning with George Washington," Presidents had, "without notable exception, treated their presidential papers as personal property." *Nixon v. United States*, 978 F.2d 1269, 1277–78 (D.C. Cir. 1992). After President Washington removed his papers to Mount Vernon, "he ensured that they would pass by descent within his family by bequeathing them to his nephew, Mr. Justice Bushrod Washington." *Id.* at 1278. Presidents Jefferson, Madison, and Monroe likewise passed their papers by testamentary gift. *Id.* The presidential analogy would mean that former directors could take everything with them and keep it indefinitely.

The Company seeks to use *SerVaas* to reject the joint client approach and argue in its place for a *Garner*-like framework for current directors and a rule of no access for former directors. The Company's proposed regime would change the law dramatically.

42

The *SerVaas* decision did not purport to do that. This decision follows the weight of Delaware precedent and hews to the joint client regime.

### c.     The Company's Reliance On Federal Precedent

In addition to citing Section 220(d) and *SerVaas*, the Company relies on two federal cases: *Wychocki v. Franciscan Sisters of Chi.*, 2011 WL 2446426 (N.D. Ill. June 15, 2011), and *Milroy v. Hanson*, 875 F. Supp. 646 (D. Neb. 1995). Based on those decisions, the Company states that "[f]ederal courts have similarly held that one's status as a former director or officer 'does not entitle her to see privileged documents that she saw, or to which she had access, during the time she was employed.'" Dkt. 57 ¶ 21 (quoting *Wychocki*, 2011 WL 2446426, at \*9). Previously, the Company recycled arguments rejected in *Kirby*. This time, the Company recycles an argument rejected in *Moore Business Forms*, where Justice Jacobs distinguished *Milroy v. Hanson* as taking a different approach to privilege than Delaware. 1996 WL 307444, at \*5 n.5. In *Kalisman*, the court again distinguished *Milroy v. Hanson* and cases adopting a similar rule, noting that "[t]hose decisions do not accurately describe the law of this State." 2013 WL 1668205, at \*4.

The federal courts trace their approach to privilege to *Commodity Futures Trading Commission v. Weintraub*, 471 U.S. 343 (1985). That decision addressed who controlled the corporation's privilege after the filing of a bankruptcy petition. The parties agreed that for a solvent corporation, "the power to waive the corporate attorney-client privilege rests with the corporation's management and is normally exercised by its officers and directors." *Id.* at 348. The parties also agreed that "when control of a corporation passes

43

to new management, the authority to assert and waive the corporation's attorney-client privilege passes as well." *Id.* at 349. As a consequence, "[d]isplaced managers may not assert the privilege over the wishes of current managers." *Id.* If the current managers waived the privilege, it was waived. *Id.* The Supreme Court of the United States applied these principles to a corporation that had filed bankruptcy, holding the bankruptcy trustee has the power to waive the attorney-client privilege with respect to pre-bankruptcy communications. *Id.* at 353. If the bankruptcy trustee waived the privilege, then former managers could not assert it. *Id.* at 353–54.

Like *Great Hill*, the *Weintraub* decision concerned who controls the corporation's right to assert privilege following a transformative event, whatever the scope of the privilege might be. The *Weintraub* decision did not address whether the corporation could assert privilege against someone who started out within the circle of confidentiality, such as a director who had access to the privileged materials during his tenure. Yet subsequent decisions, such as those on which the Company relies, have ignored that distinction and extended the *Weintraub* rule to hold that former directors cannot obtain discovery of privileged materials created during their tenure because only the entity is the client and holder of the privilege. Candor requires acknowledging that the entity approach currently represents the majority rule in the United States. *See, e.g.*, John K. Villa, *Confusion in the Boardroom*, 24 No. 9 ACC Docket 104, at *104 (Oct. 2006).

In blackletter form, it appears in Section 73 of the Restatement (Third) of the Law Governing Lawyers.[8]

"[C]ourts which apply [the entity approach] emphasize that it is only current management through which the corporation acts." Villa, *supra*, at *104. To reach this result, the entity approach treats directors as the corporation's agents. The Restatement explains this oddment as follows:

> Directors of a corporation are not its agents for many legal purposes, because they are not subject to the control of the corporation (see Restatement Second, Agency § 14C). However, in communications with the organization's counsel, a director who communicates in the interests and for the benefit of the corporation is its agent for the purposes of this Section. Depending on the circumstances, a director acts in that capacity both when participating in a meeting of directors and when communicating individually with a lawyer for the corporation about the corporation's affairs.

*Id.* § 73 cmt. d. Delaware law does not view directors as agents. "Directors, in the ordinary course of their service as directors, do not act as agents of the corporation . . . ." *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 678 A.2d 533, 539 (Del. 1996). "A board of directors, in fulfilling its fiduciary duty, controls the corporation, not *vice versa*. It would be an analytical anomaly, therefore, to treat corporate directors as *agents* of the corporation when they are acting as *fiduciaries* of the stockholders in managing the business and affairs of the corporation."[9]

---

[8] *See* Restatement (Third) of the Law Governing Lawyers § 73 cmt. c (Am. L. Inst. 2000) [hereinafter Restatement], Westlaw (database updated Oct. 2022).

[9] *Id.* at 540 (footnote omitted); *see also Firefighters' Pension Sys. of City of Kans. City, Mo. Tr. v. Presidio, Inc.*, 251 A.3d 212, 286 (Del. Ch. 2021) ("Rather than treating

The fact that the board of directors governs the corporation and comprises multiple individuals means that to the extent there is a corporation that can be a client, the board of directors is the decisionmaker for the client. 8 *Del. C.* § 141(a). As *Kirby* and *Moore Business Forms* recognize, the members of the board jointly comprise the client and the corporation. It follows that the joint client rule should apply when determining whether a corporation can invoke privilege against one of the members of the board. The

directors as agents of the stockholders, Delaware law has long treated directors as analogous to trustees for the stockholders."); Ellen Taylor, *New and Unjustified Restrictions on Delaware Directors' Authority*, 21 Del. J. Corp. L. 837, 872 (1996) ("[D]irectors are not agents of either the corporation or its shareholders, because they are not subject to the control of a principal." (footnote omitted)).

There are isolated cases that loosely refer to stockholders as principals and directors as their agents, but those references allude to the well-known concept of the principal-agent problem from economic theory. They are metaphorical, not doctrinal. *See, e.g.*, *In re Invs. Bancorp, Inc. S'holder Litig.*, 177 A.3d 1208, 1223 n.83 (Del. 2017); (asserting that requiring directors to specify the precise amount and form of their compensation when seeking stockholder ratification "ensure[s] integrity in the underlying principal-agent relationship between stockholders and directors" (quoting *Desimone v. Barrows*, 924 A.2d 908, 917 (Del. Ch. 2007))); *Calma v. Templeton*, 114 A.3d 563, 579 (Del. Ch. 2015) ("In the corporate law context, stockholders (as principal) can, by majority vote, retrospectively and, at times, prospectively, act to validate and affirm the acts of the directors (as agents)." (footnote omitted)); *UniSuper Ltd. v. News Corp.*, 2005 WL 3529317, at *8 (Del. Ch. Dec. 20, 2005) (analogizing directors to agents and stockholders to principals). Given that Section 141(a) of the DGCL confers statutory authority on the board of directors to manage the business and affairs of the corporation, "[c]learly, directors are not mere agents." Julian Velasco, *Fiduciary Duties and Fiduciary Outs*, 21 Geo. Mason L. Rev. 157, 164 (2013); *see* Stephen M. Bainbridge, *Director Primacy: The Means and Ends of Corporate Governance*, 97 Nw. U. L. Rev. 547, 605 (2003) (reviewing authorities and concluding that "the board of directors is not a mere agent of the shareholders"); Deborah A. DeMott, *The Mechanisms of Control*, 13 Conn. J. Int'l L. 233, 253 (1999) ("Even when the parent owns all the stock in the subsidiary, its directors are not agents of the parent.").

Restatement nods in the direction of these realities by acknowledging that directors can be joint clients:

> Communications involving an organization's director, officer, or employee may qualify as privileged, but it is a separate question whether such a person has authority to invoke or waive the privilege on behalf of the organization. *If the lawyer was representing both the organization and the individual as co-clients, the question of invoking and waiving the privilege is determined under the rule for co-clients*.

*Id.* § 73 cmt. j (emphasis added) (citation omitted). But the Restatement treats a joint representation as the exception rather than the rule. Delaware's approach correctly recognizes that the individuals comprising the board jointly constitute the client and are within the circle of confidentiality for purposes of privilege, unless the corporation follows one of the three acknowledged methods for excluding a director from the circle.

When courts reject the joint client approach in favor of the entity approach, they typically assert that adopting the joint client approach "would have a perverse chilling effect on candid communications between corporate managers and counsel" because of the risk that a former fiduciary might be able to use the information in litigation. *E.g.*, *Las Vegas Sands v. Eighth Jud. Dist. Ct.*, 331 P.3d 905, 913 (Nev. 2014) (internal citation omitted). In the abstract, that sounds like a valid concern, but it does not hold up against real-world considerations.

Evaluating whether the joint client approach might deter boards from consulting with counsel requires weighing (i) the benefits of consultation against (ii) the likelihood of losing privilege. The advantages of consultation are extensive. The directors benefit from legal advice about what course of action to take, and they gain a potential

affirmative defense in the form of reliance on advice of counsel, which renders them "fully protected" under Delaware law. 8 *Del. C.* § 141(e). Perhaps more important are the advantages of invoking privilege in discovery. Experience teaches that corporations invoke privilege aggressively and widely, and it is not too extreme to say that the starting point is often to assert privilege whenever an attorney is copied on a communication. *E.g.*, *Thermo Fisher Sci. PSG Corp. v. Arranta Bio MA, LLC*, 2023 WL 300150, at \*6 (Del. Ch. Jan. 18, 2023) ("The evidence presented by Defendant, coupled with my *in camera* review, strongly indicates that Plaintiff repeatedly and unthinkingly claimed privilege over non-privileged communications simply due to the presence of a lawyer in preparing its log."). Corporations even invoke privilege when a lawyer is *not* a part of the communication. *Id.* at \*3 (collecting examples). And corporations invoke privilege when a lawyer is not acting in a legal capacity, is giving business advice, or is relaying facts.[10] In this court, corporations regularly generate privilege logs spanning hundreds of pages, with scores of entries per page. Why does this happen? Because information is power, and privilege provides a basis for withholding power from an adversary.

---

[10] *See, e.g.*, *MPEG LA, L.L.C. v. Dell Glob. B.V.*, 2013 WL 6628782, at \*2 (Del. Ch. Dec. 9, 2013) (applying rule that "attorney-client privilege protects legal advice only, and not business or personal advice" to reject certain assertions of privilege); *PharmAthene, Inc. v. SIGA Techs., Inc.*, 2009 WL 2031793, at \*2 (Del. Ch. July 10, 2009) (same); *In re Circon Corp. S'holders Litig.*, 1998 WL 409166, at \*5 (Del. Ch. July 6, 1998) (overruling assertion of privilege for business strategies; noting that the privilege "covers only legal advice and, where appropriate, even facts delivered to an attorney for the purpose of forming a legal opinion can be discovered"); *Hoechst*, 623 A.2d at 1122 ("The privilege only protects the communications themselves and does not prevent disclosure of the underlying facts which are the substance of the communications . . . .").

The counterbalancing risk is that on occasion, litigation will arise with a director. How often does that happen, and what are the consequences? Not often and not much.

Evidencing the infrequency of the issue, the number of cases involving director privilege is few. *See* Gergacz, *supra*, § 2:5 (collecting cases). Given the number of corporations (both public and private), the number of directors, and the amount of litigation, that yield suggests a trivial risk.

Evidencing the insignificance of the effect, the joint client rule only renders privilege unavailable *as to the joint client*. The privilege remains intact for parties outside the circle of confidentiality. Not only that, but corporations can mitigate any risk from the joint client approach with a modicum of planning. Corporations can use contract, committees, or clear notices of adversity to control the aperture of confidentiality. And even without advanced planning, all is not lost. In litigation in this court, a judicial officer can enter an order under Delaware Rule of Evidence 510(f), which provides that "[n]otwithstanding anything in these rules to the contrary, a court may order that the privilege or protection is not waived by disclosure connected with the litigation pending before the court—in which event the disclosure is also not a waiver in any other proceeding." A similar procedure is available in federal court. *See* F.R.E. 502(d). Joint client materials can be produced under such an order. The inability to invoke privilege against a joint client who was within the circle of confidentiality does not mean that privilege is lost as to the world.

This balancing so dramatically favors consultation with counsel that the real-world effect of the joint client rule is undoubtedly nil. Delaware's experience proves the point.

49

Despite following the joint client approach since 1987, there has been no perceptible decline in the invocation of privilege. Like Topsy, it grew.

On the other side of the ledger are clear advantages to the joint client approach. It guarantees that a current director cannot secretly be excluded from discussions or denied access to materials, and it ensures a former director is not treated like a banished outsider, but rather as someone who previously held an important role and was inside the circle of confidentiality. A former director should not have to fight through a thicket of privilege to obtain materials created during the director's tenure. The stockholder who appointed the director and who had access to that information should not have to fight through a thicket of privilege either. If a corporation wants to limit the sharing of information, there are recognized means available.

Most importantly, the joint client approach prevents lawyers from claiming the authority to tell directors what to do. The entity approach inverts the power structure by putting the directors in the subservient role as agents of the corporation, thus enabling lawyers to assert the dominant role as the representative of the organization. This case provides a clear example. When Weiss disagreed about the proper way to proceed, Company's counsel gave Weiss the following instruction:

> I'm now directing you, as company counsel, not to reach out to investment bankers for the purposes that you describe below because, in my opinion, your proposed actions may or would violate the exclusivity terms of the letter of intent, and could result in a breach which could subject the company, the board and you to liability.

Dkt. 75 Ex. Q at '597. Company counsel later reiterated this directive, stating: "Please allow this email to serve as clear instructions to you that you may not reach out to bankers." *Id.* at '594.

Lawyers can and should give advice. Lawyers can and should tell directors if they believe a course of action could result in a breach of fiduciary duty. And lawyers can and should explain the potential consequences to the Company. But lawyers should not be giving orders to directors. If a director determines that fiduciary principles mandate a particular course of action, then the director has a duty to act.

If the Delaware courts had never addressed how the attorney-client privilege applied to a director, then there could be reasons to follow the entity rule. Delaware, however, has adopted the joint client rule, and there are good reasons for it. This decision adheres to the joint client regime.

## C.    The Quasi-Laches Argument

The Company's last argument is that the Funds waived their right to obtain privileged communications because they waited too long to assert it. The Company points out that Weiss and the Funds did not immediately challenge the Company's assertion of privilege after the Company produced a redacted set of minutes for a meeting of the Board that Weiss attended on November 8, 2021. Invoking a laches-like concept, the Company argues that the Funds cannot challenge its privilege assertions now.

Obtaining information in discovery is not like filing a cause of action. Accepting for purposes of analysis that a substantial delay in mounting a challenge could warrant

denying a discovery motion in an appropriate case, this is not it. Having properly filed an appraisal proceeding, the Funds may seek discovery to pursue their claim.

Under Rule 26(c), a court may issue "any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." The Company has not relied on Rule 26(c). The Company seeks to create a new rule in which a party must mount a challenge to a position taken in discovery when the opponent first asserts it, or the party forever loses the opportunity. That is not how discovery works. This court is busy enough that it does not need to create incentives for hair-trigger challenges to discovery positions.

Nothing about the progression of this case suggests that the Funds waived their right to challenge the Company's assertion of privilege. Discovery remains ongoing. The Funds filed a timely motion to compel.

The Company argues that it has been prejudiced by the manner in which the Funds proceeded because the Company "has conducted its document review, served third party subpoenas, interviewed witness [sic], made decisions about counterclaims or third party claims and performed other litigation planning all based on the existence of a privilege." Dkt. 57 ¶ 31. The Company made a tactical decision to assert privilege in a manner that runs contrary to the joint client approach that Delaware courts have followed for nearly forty years. The consequences of that choice do not constitute the kind of prejudice that could support a waiver.

**D.    The Company's Cross-Motion For A Destruction Order**

The Company has asked the court to order the Funds to destroy any privileged material they received from Weiss. For the reasons already discussed, the material was not privileged as to Weiss. He was within the circle of confidentiality as a joint client. He was free to share the information he received with the Funds, and there was an expectation that he would do so. If the Company had wanted to establish a different framework, then it was incumbent on the Company to (i) enter into a confidentiality agreement with Weiss and the Funds making clear that Weiss could not pass along certain types of information, (ii) form a committee, or (iii) put Weiss on notice as to an issue where the Company believed his interests were adverse. The Company did none of those things. Its cross-motion for a destruction order is therefore denied.

## III.    CONCLUSION

The Funds' motion to compel is granted. The Company cannot invoke the attorney-client privilege to withhold materials created between November 14, 2019, and December 8, 2021, except that the Company can assert the attorney-client privilege regarding communications relating to Weiss's books-and-records request after he sent it on December 7. The Company's request for a destruction order is denied.